Good morning, your honors. I'm Eric Honek for the city of West Hollywood, Community Redevelopment Commission. Your honor, um, after the decision about the Supreme Court in the rates case, I believe the only salient issue left before the court is the issue of the City's innocent owner defense. And I believe the City will submit that based on the decision by the District of Forfeiture based on cultivation of marijuana at the property. So the question is, can the City prove that it was an innocent owner by a preponderance of the evidence? And whether there's a genuine issue of material fact as to that. The City certainly waited around. I mean, once the Supreme Court ruled, um, you know, the City had done something very promptly. I'm not sure we'd be here. I mean, I think the government probably wouldn't have even pursued the case. But essentially what happened, the City sat around knowing full well about the activity. I mean, no doubt the City was aware of it. No doubt aware of the Supreme Court's opinion, which said once and for all that it was illegal under federal law and did nothing. Actually, there's three different events that justified the City's actions. One is that the property, the use of the property did terminate after the Supreme Court decision. I'm sorry? The use of the property for cultivation did terminate after the Supreme Court decision. Didn't they find 500 plants in there when they went in? They had the plants there, but they stopped the actual operations. The plants that were still there were still there, but they made... I mean, how do you stop plants from growing? Well, yeah. I mean, the plants were alive, but they made preparations to... Plants don't stay alive for four months unless somebody gives them water. Of course that's true, Your Honor. But the... Well, I don't know what... I mean, it's not a trivial point. I don't know what it is exactly you're saying. They have live plants on the property, and over the course of four months, somebody had to have watered and, you know, do whatever it is they do, give them light, avoided, you know, fungi or whatever it is marijuana plants are subject to. So somebody was cultivating them. So I don't know in what sense you can stand there and argue with a straight face that they weren't cultivating, that the cultivation activities had ceased. There's a second part to that, Your Honor. Well, no, let's talk about the first part, because you raised the first part, and I want to understand it. If you're giving up on that... You know, if you wait until Judge Kaczynski finishes, we'll be able to understand your answer. You know, you started with a point where you said the activity had ceased. I have no idea what you mean by that. What I mean is they started making arrangements to sell the building, and they were scaling down their operations. I'm sorry, who is they? The L.A. Cannabis Resource Center started... But the question is not what they were doing. The question is what was the city doing. You know, the city learned on day one, which I will call, you know, the day the Supreme Court opinion comes down, learned on day one, I mean, I call that day one, that this activity, which it had thought was legal, but not without justification since they didn't give an opinion. I mean, there was an opinion from our court saying it is, learned it is illegal, okay? And on that day, there were still people in the building doing all the things that people do to cultivate cannabis. And what I'm asking is what did the city do at that point to act as an innocent owner? Did it call the sheriffs and say, hey, go in there, raid it, pull out the plants? Did it call the tenant and say, you know, you've got three days to kill the plants and move them out? I mean, did it do anything like that? The city had discussions with the LACRC about selling the building and getting rid of their interests. And the city believed that that was going to happen shortly. And there was an actual buyer that was getting ready to buy it who wanted to put a children's gym in the building. So they were actually making preparations to get rid of their interest in the property, the owners of the building. But you're not claiming that it did anything to cause the actual stopping of the illegal activity. No, no, no. The city did not call up the sheriff and say, please raid the property. It didn't do that. And furthermore, the city had a security device, a deed of trust. Correct. And under the deed of trust, one of the things that the borrower has to do is conform with all legal requirements. It didn't say either stop your operation or pay the note immediately, because otherwise we're going to declare a default under the deed of trust. No, it didn't take that action. There was a clause in the purchase agreement that said if there was final unappealable decision by the federal courts that determined that this action of this property would be illegal under federal law, that the city had the right to take a default. The city, though — And you don't dispute the premise of Judge Beyer's question, and that is what I understood to be the premise, and that is that they now had a right. They had now reached a point where they could have triggered that provision. No, I — I mean, they weren't planning to go to the World Court. They weren't planning to go to file a petition for a hearing. I mean, there wasn't anything like that going on. Once the Supreme Court acted, that was the end of the line. Not in the city's mind, no, Your Honor, because the decision was relating to an injunction in Oakland having to do with a cannabis club in Oakland. It was an anticipatory injunction to determine whether the federal government could shut down a particular club in Oakland. That club did not have any specific patients who had serious illnesses, and the Supreme Court's decision in the Oakland case left open the possibility that there may still be a common law necessity defense for those type of persons. So the city was waiting for the remand to the district court to determine whether there was, in fact, going to be an exemption in that injunction, leaving open for the people who were the medical patients in the city's case. That injunction did not apply to the city at all. In fact, the government, federal government, never took any action against the LACRC in West Hollywood. I'm not understanding. That was the question of whether or not if criminal charges were brought, somebody might raise as a defense necessity. But that's a different question from the one I understood Judge Baird to be asking, and that is whether or not the city here, the redevelopment agency of the city, had the right under its illegality provision to trigger a demand that these people cease their illegal activity or that they would foreclose. And it is not my understanding that you have to exhaust all possibilities of all defenses, alibi, whatever, in order to trigger that kind of provision. You don't have to be 100 percent sure that there will be a conviction. I mean, let's say you think they are engaged in, you know, some totally other, let's say you think they are running a restaurant and they are, in the back, they are slaughtering cattle for the restaurant, I mean, which is, I gather, illegal under state law. You would not, I mean, to do there, you know, without a license for a slaughterhouse. I gather that you would not take the position that you have to wait until all defenses are exhausted and there's an actual conviction before you could trigger a clause in a mortgage saying stop, you know, stop your illegal activity or we'll foreclose on the mortgage. There's no question anyone can file a lawsuit at any time. Well, you didn't have to file a lawsuit. You had nonjudicial foreclosure. Sure. And you could have excised your nonjudicial foreclosure. And if West Hollywood or the cannabis center thought that some defense such as the necessity defense existed as to West Hollywood, which didn't exist as to Oakland, you could have brought a temporary restraining order to restrain the nonjudicial foreclosure. That wasn't done. A lot of things could have been done by either side. But the city had been working closely with the sheriff's office, and it was the city's understanding that Proposition 215 was still viable in the state and that these people might still have, the people who were members of the cooperative, might still have the right to acquire the marijuana, the medical marijuana for their. It could have been tested by the procedure I've just indicated. It could have been tested, right. But there was a very short timeline between the time the Supreme Court ruled and the time that the DEA came in. And, in fact, the DEA did nothing. It was four months. It was four months, yes, Your Honor. That doesn't sound real short to me. Well. That's 120 days. We're talking about a governmental entity. I think most of the court, the court, the judges know here that governments don't move quickly in every case. At their peril. Let me try something else on you. You lost on summary judgment, am I right? Correct, Your Honor. And what you're really telling us, among other things, is that you're able to raise a genuine issue of material fact on the innocent owner defense? Correct, Your Honor. I'm having problems with that because if you look at the innocent owner defense, you have to be able to demonstrate or create or pass that threshold that you were reasonably without cause. So it really doesn't make much of a difference what you actually believed after evaluating your situation. It's whether you were reasonably without cause. And here you talk about the Sheriff's Department, but as far as I can tell, the Sheriff's Department told you at all times that this was against federal law, what was going on. It didn't make any difference what state law was, that federal law prohibited this. And there's no dispute about that at all in the record as far as I can tell. That you were told it was against federal law, that's the end of it. And so how could you possibly be without reasonable cause to think you might be in trouble if you were told and you understood that this violated federal law? Actually, there was a statement, I believe, in the government's excerpt record of a deposition of a Captain Odenthal from the Sheriff's Department who made the statement that he believed that it may be against federal law, in addition to it could be other offenses. However, the city understood Prop 215 to provide an exemption. What the city understood is irrelevant. It's whether you were without cause. And you had cause. Question, when you were still with the Sheriff's Department, was there ever any discussion about whether federal law still prohibited marijuana growing and distribution, even though state law permitted it? Yes. Did you communicate that? I communicated that to everybody. I communicated that to West Hollywood city representatives while I was still Captain of the Sheriff's Office. So you had cause. You were told federal law gets you whether the state law does or doesn't. But the problem was there was a decision by this Court, the Ninth Circuit, saying there was, in fact, a defense. But you're at your peril because it's whether you were without cause. And you had cause to believe that you didn't qualify for it. The cause was federal law. That's not what the statute reads. Actually, it was the city reasonably without cause to believe the property was subject to forfeiture. So there's several steps to that, Your Honor. First of all, it has to be whether it's reasonable or not. And they relied on the Ninth Circuit's decision in the Oakland cannabis case to believe that there was a defense. But the statute doesn't say whether you're reasonably believed. The statute said whether you're reasonably without cause. Reasonably without cause to believe. That's what the statute says. Without cause to believe. So your belief becomes irrelevant. Your analysis becomes irrelevant. It's whether you had cause or you didn't. And you had cause here because you knew that no matter what, federal law was going to be coming down on you. But Congress put the word believe in the statute for some reason, Your Honor. Cause to believe. Cause to believe. Right. And they had cause to believe that the Ninth Circuit accepted a medical necessity defense to the people who were these medical patients at this. But they also had cause to believe that the property was subject to forfeiture. No, they didn't, Your Honor. And that's why they put the clause in the purchase agreement saying we don't have cause to believe. However, if there is a final decision that affects these particular, this particular use of the property, then those circumstances might change. But that section in the agreement in black and white shows that they did not have cause to believe. They didn't just make that up and pull it out of thin air saying we're going to ignore the federal statute. Maybe I'm hung up on the cause. Maybe. You're hung up on belief. I'm hung up on cause. Well, I think both words are in the statute for a reason. If you go with Judge Todd's position, I gather, and I don't want to put words in his mouth, it wouldn't matter whether the Supreme Court would do what it did. If the government had started forfeiture proceedings even while the Ninth Circuit opinion was in effect, under that position you would be, you would be, you would have cause to believe that there is, you know, sure you had a favorable decision from an intermediate court, but you also had cause to believe that there was a violation. And I think that would, if we were in that situation, I think that would present a much more difficult case, at least for me, because, you know, I think that is a plausible reading of the statute. And, you know, I, you know, again, I think that would be a difficult case. But you're really not there. Whatever cause, I mean, you had some cause, as Judge Todd points out, to believe even while there was a Ninth Circuit opinion in place. But once the Ninth Circuit opinion was struck down, it becomes very hard for you to argue that you didn't at that point have cause to believe that violations were going on. And I understand if it happened the next day or, you know, even a week afterwards, you say, gee, we didn't have time to do anything. But four months later, it seems to me, you have plenty of cause to believe, and you have plenty of things that you could have done, including, as Judge Baer suggests, given notice that your foreclosure or whatever of a private sale, you could have started a judicial foreclosure as well, right? There are parallel rights under California law, right? You can go by nonjudicial foreclosure. You can go by judicial foreclosure. So let's say you weren't sure of your rights. Maybe the safer thing to have done is to commence a foreclosure action in Superior Court and basically give it to the court and say, here, you, Superior Court judge, you decide what the issue is here. And at that point, I think you would have had a very good defense, a very good position of the onus and owner. You've turned the matter over to a court, and you are promising to be bound by whatever the court says. But, you know, I just still have a very hard time believing that three-and-a-half months or four months later, people are still sitting there growing the stuff, plant, you know, watering the plants, presumably plucking the and drying the leaves, you know, whatever it is that they do. And this is all going on with the city, and the city is entitled, as an innocent owner, to say, well, there's nothing we need to do. We can take our time to do it. I think there's two issues that I think the court should consider. One is what I said before, which is the LACRC was in the process of selling the building to terminate the use. So there was no reason to take affirmative default action if, in fact, they were going to go ahead and sell the building. And they were in the process of discussing with the buyer at that point to sell the building. They had a buyer already identified. Do you think that cultivation during those 120 days helped to sell the building? Why couldn't they close the whole cultivation down? Selling the building doesn't really require you to cultivate. Which leads me to the second issue that we haven't discussed, which is the city's reliance on the inaction by the federal government. All this time, for years, the federal government took no action whatsoever. You're trying to raise an estoppel point? It's corroborating evidence of the subjective belief of the city that the federal government took absolutely no action whatsoever. The only action they took across the country, or I'm sorry, across the state, was a civil injunction against a club that was very different than the one in West Hollywood. And there are reports which are corroborative. We're not saying that the city read these reports, but they show that the federal government itself believed that the law was not settled, the law was not final. And they took no action because of that. And the city's testimony in the record is that we relied on the inaction by the federal government. In that four-month period, again, the federal government took no action. A simple phone call from the DEA or the U.S. Attorney's Office saying, look, we want you to take a fall or we want some action to stop, that would have ended this completely, Your Honor. The property was being sold, and it's in the record. I thought you said it took government a long time to react. It did. Now they can react immediately on a phone call. Well, if there was a phone call, is the answer, Your Honor. If there were a phone call and they reacted like that, we wouldn't be here. That's a nice scenario, but it doesn't do anything because it's not what we're dealing with. But the city was in close contact with the sheriff's office, who works in close contact with the DEA and the U.S. Attorney's Office. Did the city make a phone call to the U.S. Attorney? Did the city call the U.S. Attorney and say, what should we do? No. No, Your Honor. But it should have been the other way around. But the city was already relying on the fact that DEA had no interest in doing anything with regard to the property up to that point. For four years, they had no interest. After the decision, no interest. Expressed no interest whatsoever, and suddenly, out of the blue, four months later, there's a raid on the property, Your Honor. And we're not talking about drug dealers here, Your Honor. We're talking about a city who works cooperatively with other governments, presumably. And a phone call from the U.S. Attorney to the city attorney of West Hollywood, I think, would have solved this. But I don't know. Does the city have to go and call around, make phone calls and say, what should we do in this case? Can the city rely on the fact that the federal government showed no interest in doing anything? The property was being sold. The use was going to be terminated. There's sort of an interesting issue here because you are aligned to some extent on the fact that this is a city and it's involved in public functions and maybe was owed some sort of courtesy by another governmental entity. But in another sense, it's just a mortgage holder. I mean, it's, you know, what you're asserting here is not a governmental function as such. This is somebody who's making a profit on a commercial paper that's secured by, and I am just wondering to what extent we give, we treat West Hollywood or Beverly Hills or, you know, City of San Francisco, you know, whatever municipality comes before us, when it is engaged in what is, from beginning to end, a commercial activity, to what extent do we give them an excellent measure of deference? I think the difference is that we're not talking about a bank, like Wells Fargo in this case, who has a cooperative relationship with another government. What happened to them, by the way? They settled out, Your Honor. I believe it's in the record that they received some of their, a portion, I think maybe it was a third of the amount of their lien back from the government as part of the settlement. And the city would not settle out, Your Honor. The city believed in their position and there was no settlement. The city what? The city believed in their position and did not settle. I think the city was given the same chance to settle and didn't. You know, I don't recall. It's settlement. Yeah, it's settlement discussions, Your Honor. But the Wells Fargo settlement is part of the record. It's a consent judgment in the record. But that's what happened with the bank. But the city's different. Wells Fargo didn't foreclose either. Wells Fargo did not foreclose either. But Wells Fargo was in a different position. They didn't have the consultation with the sheriff's office that the city did and with the ongoing relationship with the sheriff. And as far as relying on the inaction by the federal government, there's nothing in the record supporting Wells Fargo's claim as opposed to the city and the city's cooperation with government. And the LACRC's ongoing cooperation. There was nothing showing that Wells Fargo knew about the cooperation with the DEA that the LACRC had as far as the inspection on the property and the other federal agencies. Okay, thank you. I have about two and a half minutes left, Your Honor. Actually, you have minus two and a half minutes. If there's any opportunity to respond, I'd like that, Your Honor. We'll see you. Thank you. Good morning, Your Honor. May it please the Court, my name is John Lee, and I represent the United States in this case. I would agree with Mr. Honig that the Supreme Court's decision in Gonzalez v. Raich disposes of the Commerce Clause issue and given Mr. Honig's statement in their reply brief that 21 U.S.C. 881-A7 allows for forfeiture facilitation property pretty much leaves us in the position of really having to focus on just the innocent donor issue. On that issue, I would say initially that Mr. Honig stated up here that there were indications after the Supreme Court case that the city wanted to sell the property. I don't recall anything in the record or anything arising in the course of the case that indicates that that occurred. And in fact, the property did not sell until January of 2003, which is some months after the government stepped in and filed a forfeiture complaint. And even up to that time, Ms. Winderman testified in her declaration that the city's interest was in making sure that the city continued to receive payments on its mortgage. So to the extent that Mr. Honig argues that there was evidence in the record that supports their position that the city did something affirmative to try to meet the innocent donor standard of doing everything that they could reasonably do to terminate the illegal use of the property, I don't think that's supported by the record, Your Honors. Regarding the point about the Supreme Court decision, just a minor point of correction. I would say that that's actually a little more than five months by my calculation. I think the Supreme Court decision in Oakland Cannabis came down May 14, 2001, and then the DEA search warrant took place in October 25th of 2001, a little over a five-month period. That is not by relative time periods a whole lot of time, but I think that's a substantial time for the city to do something. And this is a situation where the city had a very unique relationship with LACRC. If you look at the history of what happened in this case, the city was clearly in a situation where they did hold a mortgage and they could have exercised, as Your Honor observes, the right to foreclose whether judicial or non-judicial. But you have much more in this case. You have a situation where the city really aligned itself with the Cannabis Resource Center. From day one, before the Cannabis Resource Center even came to the city of West Hollywood, they approached the top commander in West Hollywood and asked, what would you feel, how would you feel if- Who's they? You said they and you're talking about two entities. The city or LACRC? You said they approached. The city approached or who approached? The city approached. This would be Nancy Greenstein, I think at that time she was a public administrator of some sort. On behalf of the city, Nancy Greenstein- For all purposes in this case, I think the city and the commission are fairly synonymous because they're made up of the exact same people. So even before Prop 215 passed, Ms. Greenstein on behalf of the city approached LACRC, excuse me, approached the top commander at West Hollywood and asked, how would you feel if the Cannabis Club came to West Hollywood? And then from then on, they pretty much brokered this gentleman's agreement whereby the sheriff's department would not shut to close down the Cannabis Resource Center. They helped to develop some sort of an operating procedural plan that- The point of all of this is with respect to the innocent odor defense? The point that I'm leading up to, Your Honor, is that this is a situation where the commission was in a very unique position. Not only was it someone who held the right to default, but it was someone who had a unique relationship with the resource center and could have gone to the resource center and indicated in some manner, whatever shape or form, hey, this is against federal law, we'd like you to stop operating to sell marijuana. I'm not sure which way that cuts. I mean, to the extent that they did this, they did it pursuant to state law, state law which is still on the books and still valid. I mean, you know, this was not a city that was saying, well, you know, we are going to have a free love zone, you know, a free drug zone in our city. We're going to sort of promote the sale of all drugs on, you know, over the counter. You know, they were taking a narrow position delimited by a state law which had been passed by initiative by a fairly substantial margin, as I recall, and it limited quite narrowly under which circumstances the cannabis could be sold. So, really, they were exercising a governmental function. This wasn't just a sort of personal preference. You know, we don't like drug laws. They were in good faith trying to implement, you know, state law, which probably they felt enthusiastic about, they felt personally supportive of. But, nevertheless, it was the way they pursued the state law. I don't disagree with that, Your Honor. I'm not sure I agree with all of Your Honor's characterization. I certainly don't characterize the city as wild and crazy and exercising free love. But, on the other hand, the city was an entity that actually passed a resolution even before Prop 215 was passed in favor of this issue and pretty much allowed the resource center to come and operate in the city of West Hollywood. But I agree with Your Honor that the city was acting within Prop 215 and doing what it did in terms of fostering a relationship with the Cannabis Resource Center. But I think it's undisputed that the city was not acting by any stretch of the imagination within federal law when it did that. And I think that's why we're here, because of the difference between federal law and state law. And I think, in that respect, the city's innocent donor defense fails because, under federal law, they fail to do anything, really. But they certainly fail to meet the requirement that they did everything that could reasonably be done to terminate the illegal, under federal law, but illegal still, use of the defendant property. That's even better for you. Reasonably could be expected. I stand corrected on that language. And for that, because of that language in the statute, I also disagree with Mr. Honig's characterization that, subjectively, they held some belief that somehow it was lawful. I'm wondering, though, if the state law is still on the books and the state law says this is legal, can the city shut this operation down? Wouldn't that contravene state law? I mean, it's one thing to say, look, if the government comes in and shuts it down, and the federal government comes in and shuts it down, you know, it gets shut down, and then we don't have it in the city. But can the city initiate, consistent with state law, can it initiate actions that would stop an operation which state law not only doesn't prohibit, but actually affirmatively makes legal? Well, I think that's an interesting question, Your Honor, but I don't think the city had to single-handedly shut down LACRC. I don't think there's any mandate for the city to do that. But that wasn't what – and I think I would even say that that's not – Well, what exactly should the city have done, in your view? Let's say once the Supreme Court came down with its – let's put behind us the period up until the Supreme Court acted and say, well, that wasn't – everybody was in confusion, and maybe we'll agree that up to then the city could just stand by and not do anything. But the day after the Supreme Court issued its decisions, its opinion, what would the city have done? What could the city have done, consistent with state law? Your Honor, the city could have, first and foremost, exercised their option under the default clause and sought some sort of a judicial or non-judicial foreclosure. And I think that doesn't require the city to have gone in there with its police force and shut them down. They would be just in a position of someone holding a commercial paper exercising their right, and I don't think that would – I see. So what you're saying is that would have been not – they wouldn't have to pass an ordinance or something that would conceivably violate state law. They would just be acting as a private party. Does the language of the non-judicial foreclosure feature require the borrower to observe all laws or just all state laws? I think it requires the borrower to observe all laws. Do you have that language? Do you have that language at your fingertips? Your Honor, I'm looking at the government's excerpts of record volume one. That is page 269. And this is the loan agreement between the city and the Cannabis Resource Center. Paragraph 4.1.5 says, Use of the property only for purposes that are lawful under applicable local, state, or federal law, statutes, or regulations. That is what is required of LICRC. And although they did comply with state law and perhaps local ordinances, federal law is certainly what they did not comply with, and that's the reason that the government filed this case wrong. With respect to Judge Kaczynski's question as to whether or not the city should be treated somehow differently because it's also a governing agency, I think on some level I would agree that there is probably some obligation that the United States government owes to the city to try to attempt to treat the city with some courtesy and respect. But for purposes of this case, I think that because this is a very unique circumstance in which the city basically aligned itself with the Cannabis Resource Center contrary to federal law. And same thing with the Sheriff's Department. I think there is evidence in the record that indicates that normally the DEA would be joining forces with the Sheriff's deputies and trying to enforce federal law. But this is a very unique and different situation in which the city and LASD were aligned against the federal government and the federal government had to act on its own. But there was nothing that prevented the federal government from calling up before the raid and saying, look, you've got a week to clean it up or we're going to come raid it. This is not one of those raids where if you tell people about it, they're going to flush the drugs down the toilet. I mean, you weren't out to bust anybody. You were out to shut down the operation. And that could have been done by calling up the city and saying, gigs up, if you don't clean it up in a week, we'll come in and raid it. I'm not sure what the answer to that is. There is certainly testimony in the record that indicates that the DEA was concerned enough about LASD's indicated position on this issue. What could they have done? I saw those indications in the record. But what would LASD have done? I don't know exactly what LASD could have done, but I think that. . . Was anybody actually arrested in this? Were there any criminal charges that grew out of this? Yes, Your Honor. There were criminal charges that were brought against the organization as well as the three principal officers of LICRC, Scott Imler, Jeffrey Farrington, and Jeffrey Ublon. And I think the. . . I don't know that we can second guess the DEA's enforcement position at this point, but they felt in the exercise of their law enforcement duties that they could not in good faith give advance warning to LASD and therefore chose not to do so in this case. And I think given the record in this case of how closely aligned the city was with not only the Sheriff's Department but with LICRC, I'm not sure that we're in a good position to second guess the DEA on that point. I suppose in some other situation, probably the more appropriate thing to do would have been to make a phone call, as Mr. Honig suggested. But I don't think that this is the case, and I don't think that the DEA can be criticized for not doing that in this case. What's your best argument that the innocent under defense doesn't apply here? The best argument, Your Honor, is that the statutory language makes it clear that it is the city's burden to show that they did everything that they could reasonably do to terminate the use of the property or be without reasonable cause to know that the property is subject to forfeiture. And the best argument, Your Honor, is that the facts are undisputed on that issue. They had ample notice, and they did nothing during, before the Supreme Court decision, certainly, and even after the Supreme Court decision, and even up until the time of the sale on January 31, 2001, to do anything to terminate the use of the property. And that's why this case was appropriate for summary judgment. The question, though, WHCDC held the power to revoke permission to use in case an illegal purpose was being pursued there. I'm sorry, Your Honor. They had the power, Wells Fargo and WHCDC, to revoke permission to use the property if illegal things were going on there. They didn't even exercise that power. I would concur with that, Your Honor. By virtue of the loan documents that they signed, they certainly had that unilateral power, and they didn't exercise it. And the record, I think, makes it clear the reason they didn't exercise it is not because there was a lack of time, but because they simply didn't want to. Okay. Thank you. I'll give you a minute for rebuttal, if you wish to take it. Thank you, Your Honor. I think there's a couple of important points that were raised by the Court here. First of all, this is a case of first impression. There's no body of law at all regarding the innocent owner defense under the new statute, the Civil Asset Reform Act, and as far as applicable to these examples that were provided in the innocent owner defense. And that's another point. These are examples that are given. These are not statutory requirement. The statute says here are ---- Who created the examples? Congress created examples. But it's not definitive saying these are the only ways that an innocent owner can show that they did what they could. In the Deeds of Trust, specifically, there is the permission to revoke, the power to revoke permission to use the property in case it's being used for illegal purposes. At some point where it's clear that that was happening and the court below on the other side says you didn't raise a finger. Did you? No, Your Honor, but ---- Isn't that the end of it? No, because the statute ---- Why not? We're on summary judgment right now, Your Honor. The question is, is there a genuine issue of material ---- If you did nothing, how can you have a genuine issue of material effect on that issue? Because I'm going to tell you. Okay. The statute, that example in the statute for terminating use says that the innocent owner did not timely revoke illegal use of the property. We're on summary judgment, Your Honor. So is there a genuine issue of material fact that whether the city acted in a timely manner based on the unsettled nature of the law? The question is timeliness, and I don't believe as a matter of law, and there's no body of law at this point. I don't believe as a matter of law the city did not act timely, and I don't believe this court can say, and the district court can say as a matter of law that the city did not act timely. There's no state law that's in the record or signed by anyone that says that the city has to act within a certain amount of time. So if we're using that example provided by Congress, the question is can a reasonable jury find that the city acted or did not act in a timely manner? What evidence is in the record that shows that the city was impeded by some circumstance from exercising its notice of default under the deed of trust? What's in the record is the city's statement that the law was unsettled still after the Supreme Court's decision in Oakland. In the Oakland cannabis case. And Justice Stevens' concurring opinion in that case said we're deciding a very narrow issue here, Your Honor, that there are open questions still remaining as to possible defenses here. So did the city as a matter of law act reasonably in waiting during the four or five months time period, a city, a governmental entity, waiting several months, waiting a four-phone call, maybe, or waiting for some decision on remand, can that be considered timely in that time period? And I don't believe as a matter of law there's anything in the record that says they did not act in a timely manner. What decision on remand were you waiting for? The decision from the Supreme Court back to the district court to act on the injunctions. Well, I'm sorry, there was a remand by the Ninth Circuit to the district court to modify the injunctions or consider modification of the injunctions. And how would that have made raising marijuana legal? Because the Supreme Court left open possible defenses. They talked about a common law medical necessity defense other than a federal statutory medical necessity defense. And the Supreme Court's decision actually did say we recognize there is in fact or could in fact be a common law medical necessity defense. And so I believe the city reasonably waited to see what could happen on the remand, and understanding that nothing was happening, no action was taken. And is that the explanation in the record that the city gave? Yes, Your Honor. Yes, it's in the record by Aline Wenderman in her deposition testimony, or her declaration, I believe, Your Honor. So the question is, if we're relying on that one example provided by Congress, I don't believe, again, as a matter of law, it says that the city did not act in a timely manner. Thank you. The case is argued and canceled. Thank you, Your Honor.
judges: Kozinki, Trott, Bea